[Crim. No. 1052. Fourth Dist. Mar. 30, 1956.]

THE PEOPLE, Respondent, v. DAVID LEE JAMES, Appellant.

William B. Enright, under appointment by District Court of Appeal, and Buttermore & Lightner for Appellant.

Edmund G. Brown, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

GRIFFIN, J.—A trial by jury resulted in the conviction of defendant and appellant on a charge that he did, on April 4, 1955, take a wallet and money from the complaining witness B. C. Sullivan, by means of force and fear. He admitted a previous conviction of a felony (burglary) for which he served a sentence in state's prison. His motion for a new trial was denied.

About 7:30 p. m. on April 4th, Sullivan, a bakery driver, was in Linda Vista. He stopped his bakery truck about 250 feet from a street light and blew his whistle announcing his presence to the customers. A colored man approached him and when about 8 to 15 feet from him, asked for one dozen dough-

nuts. Sullivan went to the rear of the truck, opened the doors, and as he did so he was struck several times with a wooden club on the head and hands from behind, by an assailant as he raised his hands to protect his head. He fell to the ground but was not knocked unconscious. The assailant took his wallet, containing checks and bills, and his money changer, which contained about $12 in small change—quarters, dimes, nickels and pennies. Sullivan later identified defendant in the jail lineup and in court. His identification was based on the fact that he was colored, about 6 feet 1 inch tall, medium build, and weighed about 165 to 170 pounds. At the trial he testified that although he was not "absolutely positive" of his identification, he said "It looks like him, more so than anybody I have ever seen."

The police officers searched the neighborhood and found Sullivan's wallet in the front yard of a neighbor, with $40 in bills and checks still in it. The money changer was empty, and was found near the steps of another house. A split board about 1 inch by 3 inches and 16 inches long, with blood and hair upon it was found about 5 feet back of the truck.

A Mrs. Stewart, a friend of defendant for some years, lived in that vicinity. About 8 p. m. on April 4th defendant came to her home and gave her six children 30 cents each in small change, which he had just taken from his pocket and had stacked on the table. She testified he had about six or seven dollars in pennies, dimes, nickels, quarters and a few half dollars; that defendant asked if he could sleep there on the couch the rest of the night, and she let him. She then said after that occasion she learned of the robbery of the bakery man from the neighbors and of the taking of considerable small change from him; that later, she told her sister of the facts and when defendant visited her two sisters, in her presence, one sister asked defendant if he "held up the bread man" and defendant said "no" at first and then later said "yes"; that he was asked as to how he did it and defendant replied: "I asked him if he had any doughnuts— He said 'yes'," and he told the driver to give him some; that he got out of the bread wagon and "I hit him over the head with a 2x4"; that he hit him once and he didn't fall, so he hit him a few more times and then he fell; and that on a later occasion in their presence, he said if the police were looking for him he would tell them he hadn't been in Linda Vista since 1950. This testimony was corroborated by the two sisters.

Defendant told the officers he had not been in Linda Vista

for three or four months, and denied the attack on the "bread-man." He denied being at the Stewart home on April 4th; and denied that he had any conversation with Mrs. Stewart or the sisters about the affair.

At the trial defendant admitted he had known Mrs. Stewart prior to his imprisonment and saw her two times after his release from prison, once at her house and again downtown; that on the first occasion she asked him to come back and live with her but he refused on account of being on parole; that he had lived with her and her children in 1952 and 1953, and with her sisters and father in a two-room house in Linda Vista. Mrs. Stewart denied these facts. Defendant could not say where he was on April 4th, and denied generally the testimony of the prosecution's witnesses. There is no question about the sufficiency of the evidence to support the findings of the jury.

Defendant's main contention is that the prosecuting attorney committed prejudicial error in his *voir dire* questioning of one of the members of the jury, after all of the prospective jurors had been generally examined by the trial judge and defendant's counsel had passed the jurors for cause. Counsel for the prosecution propounded this question to one prospective juror, after asking her if she had served on this jury panel before and receiving an affirmative answer. He asked: "Q. The fact it was eleven to one for conviction in a prior trial of this case would not influence your decision in any way, would it? A. No." Objection was made to this line of inquiry as being improper, and the court sustained the objection and admonished the jury to disregard it. Out of the hearing of the jury, defendant's counsel moved for a mistrial. The motion was argued and the court held it was an improper question but was not grounds for a mistrial. It then instructed the jury that any statements made in reference to a previous trial or what happened there was of no concern to this jury, and admonished them to disregard it. It does appear that the deputy district attorney was acting in good faith, believing that he had this right under the decision in *People* v. *Carmichael*, 198 Cal. 534 [246 P. 62], in which the court seemingly held this was a right that the defendant had under somewhat similar circumstances, as bearing upon the possible effect on the jurors' minds of the standing of a former jury in the case. The question, as propounded, was objectionable because there was no showing that the juror knew about this case or in any way had knowl-

edge of a former verdict. In fact, the juror had previously informed the court that she had not heard nor read anything about the case. The prosecutor was volunteering the information to the juror and the entire panel that the former jury stood 11 to 1. The trial court was justified in its ruling. In view of the admonition and apparent good faith of the prosecutor we conclude that no prejudicial misconduct resulted. (*People* v. *Sutter*, 125 Cal.App. 28 [13 P.2d 745]; *People* v. *Morlock*, 46 Cal.2d 141, 148-149 [292 P.2d 897].)

The next contention is that the trial judge was guilty of prejudicial misconduct throughout the trial and in instructing the jury. It appears that during the trial the prosecuting attorney asked the complaining witness, after he had given his reasons for identifying defendant: "Q. Could you be absolutely positive this was the man that hit you when you made the original identification at the police lineup? A. No. . . . I cannot say I am absolutely positive, but to me it looks like him. . . . " The court then volunteered the statement: "He doesn't have to be positive." Later, defendant's counsel asked the witness: "Can you be absolutely positive this was the man that robbed you?" An objection was made and overruled with the statement: "As I have said, he doesn't have to be positive." The witness answered: "I am not absolutely positive." This was followed by an instruction by the court:

"In all these trials when we come to a matter of identification we usually have counsel on both sides ask the complaining witness whether he is sure that the defendant was the one that was at the scene at the time of the incident. Of course, the law isn't that you have to be sure. I have an instruction here which I will give you which reads as follows:

" 'In connection with this case you are instructed that it is not necessary that an identifying witness positively identifies a defendant as the perpetrator of the crime if from an examination of the evidence you are convinced beyond a reasonable doubt that the defendant was the perpetrator of the crime charged.' "

The court then volunteered the further information:

"I would say that probably the only time that a witness could honestly say that he was positive that a defendant in a criminal case was the person that had perpetrated the crime or the incident would be if the defendant was a friend or relative of long acquaintance of the witness. Many people look familiar to other people. It has been suggested that with

colored people the hair is usually the same, . . . and with other people sometimes you have gray hair and sometimes the women have lavender hair.''

This latter statement probably only tended to confuse the jury or was intended to bring about unnecessary levity which may have been amusing to some, but probably not to the defendant who was facing a very serious charge. The claim is that the trial judge was unduly stressing the fact that the identification of the defendant did not need to be positive to assure conviction. The main portion of the instruction, as given, to the effect that the jury only need be satisfied beyond a reasonable doubt that defendant was the perpetrator of the crime, was a proper relation of the law. Defendant's counsel was entitled to know to what certainty the complaining witness did identify the defendant, and he was entitled to an answer thereto unaided by any modification of the answer by the trial judge. Since the witness did fully answer the question and left no doubt in the minds of the jurors in this respect, no prejudicial error resulted.

It is next argued that the trial judge committed prejudicial error in sustaining an objection to a question propounded to the witness Mrs. Stewart, on cross-examination, as to whether or not she had ever lived with one Griffith, who was then confined in the county jail. The ruling was followed by the remark: ''That has nothing to do with it,'' and that if it was for the purpose of impeachment it had to be on a material point. The claim is that defendant wished to show that Griffith and the witness had a close relationship; that Mrs. Stewart did not desire to have defendant resume their former relationship after his release from prison, and that this furnished a motive for the witness to testify falsely about him. The court denied an offer of proof in respect to this line of evidence.

It is the general rule that considerable latitude should be allowed to show a witness's state of mind and possible bias. (*People* v. *Pantages,* 212 Cal. 237 [297 P. 890]; *People* v. *Evans,* 113 Cal.App.2d 124, 127 [247 P.2d 915].) Nevertheless, independent evidence of the immoral character of a witness may not be introduced for the purpose of impeaching him or her. (*People* v. *Harlan,* 133 Cal. 16 [65 P. 9]; *People* v. *Burrows,* 27 Cal.App. 428 [150 P. 382]; Code Civ. Proc., § 2051.) It appears that the defendant did take the witness stand and testify generally that he formerly lived with the

witness. She denied this fact and testified generally as to her acquaintance with Griffith and said that he never became the cause of a quarrel between her and the defendant. It does not appear that the cross-examination was unduly limited.

Further complaint is made because the trial judge, after stating the proper rule that impeachment must be on a material matter, deviated to explain his version of the meaning of the words "material" and "immaterial" in "lay language," and said: ". . . if you go to the jury room and you say that so and so testified so and so, but if you can say to yourself about any of that testimony 'So what? what difference does it make?' why then it would be immaterial. If it is material and makes an impression on you and is vital to the case, why then it is material testimony."

Our research of books of learned authors and text writers, including Webster's Collegiate Dictionary and Words and Phrases, offers no assistance to us in giving approval to these definitions of the particular words related. We will conclude, however, that the jurors possessed a true understanding of the words in the first instance and were not necessarily confused by the court's interpretation. It does not affirmatively appear that the trial court's comments and rulings are similar to those condemned in *People* v. *Mason*, 72 Cal.App.2d 699 [165 P.2d 481], in which case it was held (quoting from the syllabus):

"A judge's power of commenting on the facts is not plenary and without restriction or limitation. The discretion of the judge is to be exercised in conformity with the standards governing judicial office. The judge may not assume the role of a witness. He may analyze and dissect the testimony, but may not distort it or add to it."

Judgment and order affirmed.

Barnard, P. J., and Mussell, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 27, 1956.