[No. B063838. Second Dist., Div. Seven. July 15, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
CARLOS MENDIAS, Defendant and Appellant.

198

## COUNSEL

Thomas W. Condit and Mary G. Swift, under appointments by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Janelle B.

Davis and Kyle Niki Cox, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WOODS (Fred), J.**—Charged with the willful, deliberate, premeditated attempted murder (Pen. Code,[1] §§ 664/187) of his 15-year-old son, appellant was convicted of assault with a firearm (§ 245, subd. (a)(2)). The jury found true gun use (§ 12022.5) and great bodily injury (§ 12022.7) allegations. Prior felony conviction (§ 667, subd. (a)) and habitual offender (§ 667.7) allegations were bifurcated and, after appellant waived jury, found true by the court. Pursuant to section 667.7, appellant was sentenced to state prison for life, not eligible for parole before 20 years. The 19-year sentence imposed pursuant to section 1170 was stayed.

Appellant contends the following errors require reversal or partial reversal of the judgment: (1) the giving of a flight instruction (CALJIC No. 2.52); (2) prosecutor comment that appellant failed to call certain witnesses; (3) staying rather than striking the section 1170 sentence; (4) insufficient evidence of a section 667.7 robbery prior; (5) invalid murder prior under section 667.7; (6) insufficient evidence of "great bodily injury"; and (7) ineffective assistance of counsel. We find no error and affirm the judgment.

### FACTUAL BACKGROUND

We preface our factual summary by noting the unusualness of this record. Two witnesses, the victim and his 18-year-old girlfriend, both called by the prosecutor, testified to the relevant events. Their testimony was consistent and had all the earmarks of truthfulness. In fact, when the defense attorney concluded his cross-examination of the victim (Carlos Mendias, Jr.) he stated, "Carlos, thank you for your candor." Their testimony was undisputed: appellant did not testify and no defense evidence was offered.

Fifteen-year-old Carlos Mendias, Jr. (the victim) had been living with his mother. In early 1991 he moved into his father's apartment at 1525 E. 9th Street in Long Beach. The apartment was one large room above a garage with an outside staircase. Also living in the apartment, besides appellant and the victim, were appellant's girlfriend (Marilyn) and her eight-year-old son. At the end of March 1991, the victim's pregnant girlfriend, 18-year-old Jennifer Pyne, also moved into the apartment.

On Wednesday, April 10, 1991, appellant went to work. During the day, the victim and Jennifer cleaned the apartment. Sometime in the afternoon the

---

[1]Statutory references, unless otherwise noted, are to the Penal Code.

victim began drinking beer. When his two cousins, Gilbert and Richard, arrived at the apartment he drank vodka with them. In the early evening Richard borrowed Gilbert's car and he and the victim went to Jack-in-the-Box for dinner.

Approximately 7:30 p.m. appellant returned home, parked his car in the driveway near the stairs to his apartment, and had a conversation with his nephew Gilbert. Gilbert said he was worried about his car because they (Richard and the victim) were taking so long.

Not long thereafter, Richard and the victim returned in Gilbert's car and parked by appellant's car.

Appellant criticized Richard for taking so long, saying he would not lend him *his* car. Richard retorted that it wasn't his car he had borrowed so he shouldn't worry about it.

Then appellant and the victim got into an argument. Appellant told the victim not to drink anymore and told his nephews not to let him drink. Appellant also criticized the victim for not keeping the apartment clean. The argument was intense, profane, and protracted, lasting about half an hour. The victim called appellant names and appellant became angry. He said if the victim kept acting smart he'd hit or kick Jennifer in the stomach.

Marilyn, appellant's girlfriend, heard this remark, gave appellant a dirty look, and started walking away. The victim then taunted appellant, saying: "See you're a fucking punk . . . you talk shit like that, that's why Marilyn's leaving you."

Appellant picked up an empty vodka bottle, tried to break it but couldn't because it was plastic. Appellant called victim a "fucking asshole."

The victim called to Jennifer, went upstairs, and told her "let's go." They went downstairs and walked around the block. The victim explained that appellant had kicked them out of the apartment. The victim told her to "go back to the apartment and get all your clothes."

Jennifer went to the apartment but the victim remained downstairs. Before long he and appellant were again arguing. When Jennifer came downstairs she heard appellant say to the victim "I'll kill you."[2] The victim said, "Well, let's fight."

Appellant went upstairs. After about two minutes he came downstairs carrying a .22-caliber rifle. The argument between appellant and the victim

---

[2]The victim testified appellant did not make this statement.

resumed. The victim told appellant "if you have a gun, why don't you shoot me then . . . don't bring it down here for nothing. If you are going to do it, just do it."

Jennifer saw the rifle and went toward the victim but he pushed her away because he "didn't want her to get shot."

Appellant and the victim were about 19 feet apart. The victim then said "let's go" to Jennifer and started to turn. Appellant aimed the rifle at the victim and fired. The bullet struck the victim in his upper left thigh. He "hunched over"—without falling—like he'd been kicked in "the private[s]." The wound "burned." The victim then raised his arms—in the surrender position—and told appellant, "You want to kill me, kill me."

Appellant again took aim but Gilbert, who had been standing near him, "jumped on top of him." Gilbert and appellant struggled over the rifle and a second shot was fired. The bullet shattered the driver's window of Gilbert's car.

The victim and Jennifer ran but when they turned the nearby corner the victim fell down. He lay there because "[h]e couldn't walk no more." The victim was crying because "it was pain—burned, and I was just crying."

Gilbert and Richard brought Gilbert's car to the victim and helped him into it. They—including Jennifer—drove to a hospital and took the victim to the emergency room.

A Long Beach police officer noticed the victim being helped to the emergency room, saw that he was in pain, and asked what had happened. Learning that the victim had just been shot, the officer began a crime investigation and interviewed the witnesses at the hospital. The officer remained at the hospital for about an hour. During that time he did not see appellant. He then took Jennifer to appellant's apartment. The apartment was dark and locked. No one answered when he knocked on the apartment door.

The victim was admitted to the hospital, treated for his gunshot wound, and released the next day. However, the bullet was not removed. It was still inside the victim at trial, five months later. The victim testified that the bullet "moves" but is not painful when it moves.

## DISCUSSION

1. *Appellant contends the trial court erred in giving a flight instruction.*[3]

█ Appellant argues there was insufficient evidence of flight to justify a flight instruction. We agree that such evidence was not strong[4] but disagree it was insufficient.

It was undisputed appellant was angry at his son and shot him without excuse or justification. There was no evidence appellant (in contrast to his son) had been drinking or was in any way impaired. A reasonable juror could have inferred that appellant knew he had committed a serious crime and when he did not go to the hospital where his son had been taken (presumably the one nearest their apartment) and was not home about 9:45 p.m. when the officer knocked on his door, he might well have fled. (See *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1243-1245 [278 Cal.Rptr. 640, 805 P.2d 899].)

The inference, although not compelling, was reasonable. Its weight was "a matter for the jury to determine" (CALJIC No. 2.52).

In any event, since appellant was convicted only of assault with a firearm based on undisputed evidence, error if any was harmless. (*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].)

2. *Appellant contends it was prejudicial misconduct for the prosecutor to comment on appellant's failure to call certain witnesses.*

In argument, defense counsel urged the jury to acquit appellant of attempted murder because appellant acted in a heat of passion and therefore without malice. Defense counsel stated: "So he snaps, he goes nuts."

In rebuttal argument, the prosecutor rhetorically asked where was the evidence appellant had "snapped" or gone "nuts." The prosecutor continued, "Where are the cousins who were there at the scene? Where is the defendant's girlfriend?"

█ It is these references to uncalled witnesses appellant claims as error. He is mistaken.

---

[3]The trial court gave CALJIC No. 2.52. It reads: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

[4]The prosecutor, outside the presence of the jury, stated appellant was arrested three days after the shooting but offered no evidence of this fact or of any arrest circumstances.

Although a prosecutor may not comment, directly or indirectly, on a defendant's exercise of his privilege not to testify (*Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]), comment is permitted when a defendant fails "to call an available witness whose testimony would naturally be expected to be favorable." (*People* v. *Ford* (1988) 45 Cal.3d 431, 446 [247 Cal.Rptr. 121, 754 P.2d 168, 76 A.L.R.4th 785]. See also *People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1049-1051 [5 Cal.Rptr.2d 230, 824 P.2d 1277].)

If, as his attorney argued to the jury, appellant had "snapped" or gone "nuts" appellant's nephews and girlfriend should have been able to so testify. His failure to call them was properly subject to comment.[5]

3. *Appellant contends the determinate sentence should be stricken.*

Although convicted of only one offense, appellant was subject to punishment pursuant to section 667.7 (as a habitual offender) or section 1170, if the punishment would be greater. (§ 667.7, subd. (a)(1).)

The court pronounced sentence pursuant to both sections but *stayed* the section 1170 sentence. This was the proper procedure. It ensured that appellant would suffer no detriment from the section 1170 sentence but if the section 667.7 sentence should be reversed, the section 1170 sentence could then be ordered served.

Appellant's reliance upon *People* v. *Skeirik* (1991) 229 Cal.App.3d 444 [280 Cal.Rptr. 175] is misplaced. *Skeirik* does not involve a *stayed* sentence. (See *People* v. *Burkett* (1991) 1 Cal.App.4th 971, 977 [2 Cal.Rptr.2d 330].)

4. *Appellant contends the evidence was insufficient to prove his robbery conviction involved the use of force.*

The prosecution alleged appellant had suffered two felony convictions (and state prison terms) which satisfied habitual offender (§ 667.7) requirements: murder and "robbery involving the use of force . . . ."

To prove appellant had been convicted of a robbery "involving the use of force" the prosecutor provided the trial court with the superior court file of

---

[5]The absence of prejudice is self-evident. Not only was appellant acquitted of both willful, deliberate, premeditated attempted murder and (ordinary) attempted murder but even of attempted voluntary manslaughter.

that robbery[6] (No. A024609) and requested that judicial notice be taken of its contents. The trial court took such notice. The file contained the information which alleged appellant had committed the robbery "by force *and* fear." The file also contained appellant's plea of guilty to the robbery.

■ Appellant now contends that he only pleaded guilty to "robbery" and that his plea only admitted the minimum requirements of the offense, namely "fear," *not* "force." He is mistaken.

*People* v. *Tuggle* (1991) 232 Cal.App.3d 147 [283 Cal.Rptr. 422] is persuasive. It states: "That appellant theoretically could have been convicted of robbery by fear but not by force does not negate the effect of his guilty plea. A plea of guilty admits every element of the offense charged [citation], all allegations, and factors comprising the charge contained in the pleading." (*Id.* at p. 154.)

*Tuggle* further aptly notes, "appellant offers no persuasive reason he could not have clarified that he was not admitting a robbery by force." (232 Cal.App.3d at p. 154, fn. 10; see also *People* v. *Hayes* (1992) 6 Cal.App.4th 616, 623 [7 Cal.Rptr.2d 866]; *People* v. *Guerrero* (1988) 44 Cal.3d 343 [243 Cal.Rptr. 688, 748 P.2d 1150].)

We have considered *People* v. *Brookins* (1989) 215 Cal.App.3d 1297 [243 Cal.Rptr. 688, 748 P.2d 1150], relied upon by appellant, and find it inapposite.

5. *Appellant contends his prior murder conviction was invalid under section 667.7.*

■ It was alleged and proved that in 1977 appellant was convicted of second degree murder and sentenced to the California Youth Authority (CYA). Appellant contends that such a commitment was not a "prior separate prison term[ ]" within the meaning of section 667.7. He relies on *People* v. *Seals* (1993) 14 Cal.App.4th 1379 [18 Cal.Rptr.2d 676], recently decided by Division Five of this court.

*People* v. *Seals* construed section 667.5, not section 667.7 and relied on subdivision (j),[7] a provision absent from section 667.7. *Seals* held that "a direct commitment of a youthful offender to the CYA pursuant to Welfare

---

[6]A certified copy of state prison records was also introduced into evidence.

[7]It provides: "For purposes of this section, when a person subject to the custody, control, and discipline of the Director of Corrections is incarcerated at a facility operated by the Youth Authority, that incarceration shall be deemed to be a term served in state prison." (§ 667.5, subd. (j).)

and Institutions Code section 1731.5, subdivision (a) does not constitute a prior prison term within the meaning of Penal Code section 667.5, subdivisions (b) and (j)." (*People* v. *Seals, supra,* 14 Cal.App.4th at pp. 1384-1385.) We have no reason to doubt the correctness of this holding.

Unlike *People* v. *Seals,* we are concerned with section 667.7, not section 667.5. Section 667.7, subdivision (b) contains the following provision (absent from § 667.5): "As used in this section, a commitment to the Department of the Youth Authority after conviction for a felony shall constitute a prior prison term."

Appellant omits reference to this provision in section 667.7, subdivision (b). We find this provision plain, express, and determinative. Pursuant to this provision, appellant's second degree murder conviction and CYA commitment constitute a "prior prison term" within the meaning of section 667.7.

6. *Appellant contends there was insufficient evidence of great bodily injury.*

The trial court instructed the jury that " 'great bodily injury' . . . means a significant or substantial physical injury. Minor or moderate injuries of a temporary nature do not constitute great bodily injury and are not sufficient." (CALJIC No. 17.20.)

■ Appellant, relying upon *People* v. *Caudillo* (1978) 21 Cal.3d 562 [146 Cal.Rptr. 859, 580 P.2d 274], contends that the victim's injury was not "significant or substantial" but only "moderate" and "temporary." The contention is not well taken.

*People* v. *Caudillo* was disapproved in *People* v. *Escobar* (1992) 3 Cal.4th 740 [12 Cal.Rptr.2d 586, 837 P.2d 1100]. In *Escobar* a rape victim's bloody knees, abrasions, painful neck, and vaginal soreness was held to constitute great bodily injury. *Escobar* stated: "It is well settled that the determination of great bodily injury is essentially a question of fact, not of law. ' "Whether the harm resulting to the victim . . . constitutes great bodily injury is a question of fact for the jury. [Citation.] If there is sufficient evidence to sustain the jury's finding of great bodily injury, we are bound to accept it, even though the circumstances might reasonably be reconciled with a contrary finding." ' " (*Id.* at p. 750.)

The instant victim's injury was more significant and substantial than in *Escobar.* It is similar to the gunshot wounds in *People* v. *Lopez* (1986) 176 Cal.App.3d 460 [222 Cal.Rptr. 83] and *People* v. *Wolcott* (1983) 34 Cal.3d

92 [192 Cal.Rptr. 748, 665 P.2d 520] where great bodily injury findings were upheld. In *Lopez* one victim was shot in the right buttock and a second victim in the left thigh. There was no evidence either victim sought or received medical attention. In *Wolcott* the victim was shot in the calf, the bullet fragmenting. The treating doctor removed one fragment but left the others to "work themselves out." The victim lost little blood, no sutures were required, and the victim went to work the next day.

We conclude substantial evidence supports the jury finding of great bodily injury.

7. *Appellant contends trial counsel failed to provide effective assistance.*

■ Appellate counsel argues: "In closing argument, appellant's trial attorney took the unusual and unjustified tack of stipulating[8] to the fact that [the victim] had suffered great bodily injury . . . and urging the jury to so find. . . . Counsel's argument to the jury was clearly against appellant's interests. There is simply no plausible tactical explanation for counsel's urging the jury to find great bodily injury—[ ]—in light of the disastrous consequences of that finding on the sentencing scheme."

■ In considering this claim, we apply the following review standard: "To establish entitlement to relief for ineffective assistance of counsel the burden is on the defendant to show (1) trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings. [Citations.] '[W]here the record shows that counsel's omissions resulted from an informed tactical choice within the range of reasonable competence, the conviction must be affirmed.' [Citation.] 'In some cases, however, the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged. In such circumstances, unless counsel was asked for an explanation and failed to provide one or unless there simply could be no satisfactory explanation, these cases are affirmed on appeal.' [Citation.]

■ "As the United States Supreme Court noted in *Strickland* v. *Washington*: 'Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude

---

[8]Defense counsel did not "stipulate" to the fact, he merely *conceded* the fact. Unlike a stipulation, the concession did not relieve the prosecution of its burden to prove great bodily injury beyond a reasonable doubt.

that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." [Citation.] There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.' " (*People* v. *Lewis* (1990) 50 Cal.3d 262, 288 [266 Cal.Rptr. 834, 786 P.2d 892].)

 We disagree with appellate counsel's conclusionary condemnation of trial counsel.

A fair reconstruction of the circumstances confronting trial counsel, as required by *Strickland* v. *Washington* (1984) 466 U.S. 668 [80 L.Ed. 674, 104 S.Ct. 2052] and omitted by appellate counsel, is the following:

Counsel was to defend a client whose identity as the shooter of his own son could not be disputed. There was no evidence of self-defense, client intoxication or impairment. Prosecution witnesses would testify the client was angry, tried to break a bottle to attack his son, couldn't, said "I'll kill you," then walked up a flight of stairs, got a .22-caliber rifle (and perhaps loaded it), came downstairs, aimed the rifle at his son, and as his son was turning, shot him in the upper thigh, and then tried to shoot him again. Could counsel call his client to testify to "accident"? Hardly, when the client would be impeached with robbery and murder convictions, not to mention post-shooting conduct inconsistent with "accident."[9] Could he minimize the gunshot wound (as appellate counsel does) and persuade the jury it was not "great bodily injury"? If he tried, would not the jury see the effort as further evidence of callousness by the *defendant* and with that perception more likely convict him of willful, deliberate, premeditated attempted murder?

But even if the strategy was "successful" and the jury found the section 12022.7 great bodily injury allegation "not true," what would have been gained? Little or nothing. *That* finding would not have determined the separate and *different* great bodily injury allegation pursuant to section 667.7. The latter allegation could be satisfied by proof of *either* great bodily

---

[9]Appellant did not show surprise at wounding his son; rather he took aim to shoot him again. Absent also was evidence of remorse or even concern about his son's condition.

injury *or* the use of force "which was likely to produce great bodily injury." (§ 667.7, subd. (a).) And it was the trial court, not the jury, who would determine this latter and more important allegation.

Given these daunting circumstances trial counsel determined "good trial tactics demanded complete candor." (*People* v. *Powell* (1974) 40 Cal.App.3d 107, 167 [115 Cal.Rptr. 109].) To understate the matter, in these circumstances "we cannot equate such candor with incompetence." (*People* v. *Jackson* (1980) 28 Cal.3d 264, 293 [168 Cal.Rptr. 603, 618 P.2d 149]; *People* v. *Wade* (1988) 44 Cal.3d 975, 988 [244 Cal.Rptr. 905, 750 P.2d 794].) In fact, defense counsel accomplished something of a miracle. Faced with the prospect of a willful, deliberate, premeditated attempted murder conviction, appellant was convicted only of assault with a firearm.

The contention of ineffective assistance of counsel is not well taken.

## DISPOSITION

The judgment is affirmed.

Lillie, P. J., and Johnson, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 20, 1993.